UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,    )    CASE NO:  2:12-MJ-00347-1
                         )
          Plaintiff,    )        CRIMINAL
                         )
    vs.                 )     Corpus Christi, Texas
                         )
ROBERT L. MC CHESTER, JR.,    )    Friday, April 13, 2012
                         )
          Defendant.    )    (10:21 a.m. to 12:03 p.m.)


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE B. JANICE ELLINGTON,
UNITED STATES MAGISTRATE JUDGE


Appearances:            See next page

Case Manager:          Dana Perez

Court Recorder:        Arlene Benavidez

Deputy U.S. Marshals:    Jacob Palombo; Ryan Evans
                        Justin De Los Santos

Transcribed by:        Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES FOR:


Plaintiff:                    LANCE DUKE, ESQ.
                              Assistant United States Attorney
                              800 N. Shoreline, Suite 500
                              Corpus Christi, Texas 78401

Defendant:                    KEITH M. GOULD, ESQ.
                              Assistant Federal Public Defender
                              606 N. Carancahua, Suite 401
                              Corpus Christi, Texas 78476

U.S. Pretrial Services:   Becky Espinosa
                          1133 N. Shoreline Blvd.
                          Room 114
                          Corpus Christi, Texas 78401

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CLAY ODOM | 7 | 27 | 46 | -- |

DEFENSE WITNESS

ROBERT L. MC CHESTER, JR.

COURT EXAMINATION  50

1    <u>Corpus Christi, Texas; Friday, April 13, 2012; 10:21 a.m.</u>

2                        **(Call to Order)**

3         **THE COURT:**  I'm going to call C-12-347-M, Robert

4    McChester, Jr.  May I have appearances, please?

5              **MR. DUKE:**  Lance Duke for the United States.

6              **MR. GOULD:**  Keith Gould for Robert McChester.

7              Your Honor, can we approach the bench for a moment

8    for a housekeeping matter?

9              **THE COURT:**  Uh-huh.

10        **(Begin bench conference at 10:22 a.m.)**

11             **MR. GOULD:**  I have a little concern this morning.

12   There's going to be a lot of -- salacious testimony in

13   evidence --

14             **THE COURT:**  Uh-huh.

15             **MR. GOULD:**  -- of a sexual nature involving a minor

16   who's 15 years of age.  We've got a full house, including, I

17   think, three or four sheriffs --

18             **THE COURT:**  Uh-huh.

19             **MR. GOULD:**  So, I'd request that we close the

20   courtroom for that portion of the testimony.

21             **THE COURT:**  Why?  I mean you have to have a better

22   reason than that, because the press has a First Amendment right

23   to be here.

24             **MR. GOULD:**  I understand.  My client has some parents

25   that are older and they've been very, very distraught over this

1  whole thing.

2          **THE COURT**:  Well, you can ask them to step outside.

3  I don't -- unless you give me a case or some legal reason why

4  they have to be excluded.  I can't take (indiscernible).

5          **MR. GOULD**:  Just the nature of the testimony and the

6  evidence.

7          **THE COURT**:  There's no case that says that just

8  because of that that they can't be here?

9          **MR. GOULD**:  No, I don't have a case with me.  I

10 couldn't tell you that.  I don't have a case.

11         **THE COURT**:  Mr. Duke (indiscernible).

12         **MR. DUKE**:  (Indiscernible) in the courtroom.

13         **THE COURT**:  I'd be happy to accommodate you, but they

14 have a right to be here.  So you can ask your clients' parents

15 to step out if they don't want to hear it.

16         **MR. GOULD**:  They're not going to be here for that

17 testimony.  I just wanted to be ready for the Court --

18         **THE COURT**:  I'm sorry, but that's what happens in

19 these cases, what they're about.

20         Anything else?

21         **MR. GOULD**:  That's all.

22         **THE COURT**:  Okay.

23     **(End bench conference at 10:23 a.m.)**

24         **THE COURT**:  Good morning, Mr. McChester.

25         **THE DEFENDANT**:  Good morning.

1          **THE COURT:**  Mr. Gould, your client is scheduled for a

2   preliminary hearing and for a detention hearing.  What is your

3   announcement?

4          **MR. GOULD:**  We're ready, your Honor.

5          **THE COURT:**  Okay.  Is the government ready, Mr. Duke?

6          **MR. DUKE:**  We're ready, your Honor.

7          **THE COURT:**  Okay.  You may be seated, Mr. McChester,

8   with your lawyer at counsel table.

9          Mr. Duke, call your first witness.

10          **MR. DUKE:**  Your Honor, we call Clay Odom.

11          **THE COURT:**  Mr. Odom, come forward to be sworn.

12          **CLAY ODOM, GOVERNMENT'S WITNESS, SWORN**

13          **THE COURT:**  You may proceed.

14          **MR. DUKE:**  Your Honor, to be clear, with respect to

15   the Court's preference on how to handle this, I'm going to call

16   the same witness, Mr. Odom, for purposes of the preliminary

17   hearing and detention issues, some of it will not reflect on

18   the preliminary.  Would the Court prefer I just ask all my

19   questions for both hearings at once?

20          **THE COURT:**  It doesn't matter to me.  What about you,

21   Mr. Gould?

22          **MR. GOULD:**  I don't have a problem with that, your

23   Honor.

24          **THE COURT:**  Just doing it all at once or separating

25   it?

1      **MR. GOULD:**  I don't have a problem doing it all at

2   once if it'll speed things up.

3      **THE COURT:**  I don't -- yeah, it doesn't matter to me.

4   However you want to proceed, unless there's some objection.

5      **MR. DUKE:**  All right.  Thank you, your Honor.

6                      **DIRECT EXAMINATION**

7   **BY MR. DUKE:**

8   Q    Would you tell us your name, sir, and how you are

9   employed?

10  A    My name is Clay Odom.  I'm a Special Agent with United

11  States Department of Homeland Security.

12  Q    Would you spell your last name, please?

13  A    Spelled O-D-O-M.

14  Q    And are you familiar with an individual named Robert

15  McChester, Jr.?

16  A    Yes, sir.

17  Q    And what is he accused of doing?

18  A    He's accused of using a facility of interstate commerce to

19  entice or induce a minor for sexual activity.

20  Q    Is that something that's more often referred to as online

21  solicitation of a minor?

22  A    Yes, sir.

23  Q    And how did Mr. McChester come to the attention of law

24  enforcement?

25  A    On April 3rd, nurses from the Spohn Memorial Hospital here

1   in Corpus Christi contacted the Corpus Christi Police

2   Department regarding a juvenile female that made an outcry,

3   saying that she had been involved in sexual activity with an

4   adult police officer at her school, Tuloso-Midway, here in

5   Corpus Christi.  And the management at the hospital called the

6   Corpus Christi Police Department so they could respond out and

7   get more details.

8   Q    And specifically, how old was the juvenile?

9   A    I believe she was 14 -- no, I'm sorry, 15.

10  Q    Fifteen.  Okay.  And that happened earlier this month?

11  A    April 3rd.

12  Q    And specifically, did she state to hospital personnel that

13  she was engaged in any sort of illegal activity with the police

14  officer?

15  A    She said that she had a sexual -- she had had sex with the

16  police officer on a number of occasions.

17  Q    And did she identify the police officer by name?

18  A    Yes, she did.

19  Q    What name did she provide?

20  A    Robert McChester.

21  Q    And so, after the juvenile made this outcry in the

22  hospital, what happened next?

23  A    Officers of the Corpus Christi Police Department

24  determined that Robert McChester was employed as a moonlighting

25  or off-duty security job at Tuloso-Midway High School;

1    confirmed that he was an employee there.  And I believe it was

2    the following day they executed a search warrant at his home

3    here in Corpus Christi.

4    Q    And I want to talk about that in a moment, but just to be

5    clear for the record, we've been referring to him as Robert

6    McChester.  He is, in fact, a junior; is that correct?

7    A    That's correct.

8    Q    So whenever you're referring to McChester, you're

9    referring to junior, not senior.  Is that correct?

10   A    That's correct.

11   Q    And so, during the execution of the search warrant, was

12   anything seized?

13   A    Yes, sir.  I believe a couple of laptops -- laptop

14   computers, a couple of phones and, I believe, his truck was

15   impounded, as well.

16   Q    And to your knowledge, have those phones and/or laptops

17   seized during the execution of the search warrant at

18   Mr. McChester's house, have they been forensically analyzed at

19   this time?

20   A    I believe they're in the process of being analyzed.

21   Q    Do you have any information regarding what the contents

22   are for any of those devices as you sit here today?

23   A    The devices taken from Mr. McChester, Jr.'s house, the

24   defendant, no, sir, I don't.

25   Q    So, after the search warrant was executed, was the child

 1  ever interviewed other than at the hospital?

 2  A    She was.  She was interviewed at the hospital and her

 3  mother was present during that interview.  The following day,

 4  she was interviewed by forensic interviewers with the

 5  Children's Advocacy Center here in Corpus Christi.

 6  Q    And during that interview, did she provide any additional

 7  detail regarding the illegal activity she was engaged in with

 8  Officer McChester?

 9  A    She did.  She provided all the details about the sexual

10  activity, the encounters, how she met the defendant.

11  Q    How did she meet Mr. McChester?

12  A    She met him at the school where he's an off-duty security

13  officer.  Shortly after meeting him, there was an incident at

14  the school wherein the victim stood up on a table in the

15  cafeteria, some kind of a disruptive behavior.  She was

16  escorted to the office by the defendant and an assistant

17  principal and they were -- I believe she was counseled in the

18  office.

19          At the time she was counseled, the defendant wrote

20  her a Corpus Christi Police Department citation that was given

21  to her and the assistant principal was present when that

22  occurred.  However, we found out that later the ticket was

23  destroyed, ripped up by the defendant and he, after that

24  incident occurred, the victim reached out to the defendant

25  through Facebook.

1    Q    Let me stop you right there.  Going back to this incident

2    that occurred at the high school, Mr. McChester, when he

3    encountered the student following this disruptive behavior in

4    the cafeteria, was he acting consistent with his terms of

5    employment there at Tuloso-Midway?

6    A    While he was stationed in the cafeteria when the incident

7    occurred?  Yes, sir.

8    Q    Okay.  And then was he further acting in his duties during

9    this meeting, I guess, that occurred with himself, the student

10   and the vice principal?

11   A    Yes, sir.

12   Q    And have you interviewed the vice principal?

13   A    We have.

14   Q    And did she recall this incident?

15   A    She did.  She remembered it.

16   Q    And did she recall the ticket?

17   A    She did.

18   Q    And did she say what she believed occurred with the

19   ticket?

20   A    To the best of her knowledge, the ticket was issued to the

21   victim and the victim was released shortly thereafter from her

22   office and the assistant principal did not know what the

23   outcome of that ticket was, if it was destroyed or the victim

24   had to respond to court.  The assistant principal said the

25   ticket was issued and then the victim left her office and she

1    never had any other discussions with anyone about that ticket.

2    Q    Did the vice principal state whether or not she had

3    advised or encouraged Mr. McChester to destroy the ticket or

4    otherwise cancel it?

5    A    She did not.  She did not advise him to destroy it.  She

6    said she was unaware that the ticket had been destroyed.

7    Q    And then you said shortly thereafter, after this incident

8    and this meeting in the vice principal's -- I assume it was in

9    the office?  Is that fair to say?

10   A    Yes, sir.

11   Q    You said the victim contacted Mr. McChester on Facebook?

12   A    Yes, sir.

13   Q    How quickly did that occur?  Are we talking months?  Are

14   we talking weeks?  Days?

15   A    I believe it was a matter of days.  I believe the first

16   contact was April 12th, 2011.  And when I say contact, I mean a

17   message sent through Facebook, a social networking site.

18   Q    Other than Facebook, has the investigation revealed that

19   McChester was communicating with the victim through other

20   means?

21   A    Cell phone.

22   Q    And just for purposes of establishing for the preliminary

23   hearing, he was communicating through which types of interstate

24   telecommunications facilities to your knowledge?

25   A    Through Internet service provider, through cellular

1  telephones, text-messaging and placing voice phone calls.

2  Q    And so, what did the victim say in this initial

3  communication via Facebook?

4  A    The victim made a comment, something to the effect of, "I

5  found you on Sam's Facebook friend -- Facebook profile page."

6  Somewhere she made reference to the fact that the defendant

7  was, I assume, a friend on Facebook to her.

8  Q    This Sam person?

9  A    Yes.  And that's how she found the defendant's profile.

10  And then she messaged him based on her finding him -- his

11  profile.

12  Q    Have you been able to determine whether or not this Sam

13  person is a real person and whether or not they are a child

14  and/or a student?

15  A    We have identified that person and they were a student.

16  She was a student at Tuloso-Midway High School.

17  Q    So, do you know whether or not -- people can be 18 years

18  of age and attending high school.  Is that fair to say?

19  A    Yes.

20  Q    Do you know whether or not this person was a minor had

21  achieved the age of majority?

22  A    If I remember correctly, I believe at the time the

23  communication began between the defendant and the victim, this

24  other student was a sophomore in high school.

25  Q    So, do you think that that other student was an 18-year

1    old sophomore or does that mean that you think that they were

2    the traditional age for sophomores I think is what, 16?

3    A    Sixteen.  I believe it was traditional age.  When we

4    interviewed the assistant principal, we discussed this student

5    and she said she believes that she is sophomore age -- or,

6    pardon me -- junior age at this point.  So, a year ago, I can

7    only assume that she would have been sophomore age.

8    Q    And do we know what, if anything, were the content of

9    those communications between McChester and this child?

10   A    Yes, sir.  After the Corpus Christi Police Department

11   spoke to the victim's mother, they received -- asked for and

12   received -- consent to search --

13   Q    No, no, no.  I'm actually asking about the other child who

14   had friended or was friends with Mr. McChester who our victim

15   then sort of found in order to gain access to Mr. McChester.

16   Has that child Sam, do we know any of the content of those

17   communications?

18   A    No, sir.

19   Q    So, victim contacts Mr. McChester.  Does Mr. McChester

20   know who victim is?

21   A    Based on the message content, yes.  He makes comments

22   about seeing her in school and her age in the beginning of the

23   messaging.

24   Q    And so, how quickly after the -- at least with respect to

25   the Facebook communications -- how quickly does Mr. McChester

1   acknowledge knowing the victim and also knowing her age?

2   A    I believe the messages that we retrieved were -- the bulk

3   of the messages began early May of 2011 and that's where the

4   acknowledgment -- the defendant acknowledges that he's aware

5   that the victim is -- I believe he said 13.  She was actually

6   14 at the time.  They exchanged messages regarding her age,

7   things that occurred at school.

8   Q    And throughout the communications during the entire length

9   of which they span -- which, by the way, when's the last

10  Facebook communication that we have?

11  A    I believe the final Facebook message was on April 2nd of

12  this year.

13  Q    Okay.  So, throughout this long May to April communication

14  period, are there numerous references to the victim being a

15  child?

16  A    Yes, sir.

17  Q    And how would you describe the first communications with

18  the -- between the victim and McChester?  What was the nature

19  of their talk?  Did it start off immediately sexual or was it

20  something else?

21  A    It did not start off immediately sexual.  It was, I

22  believe, the first few messages were in reference to the

23  incident that occurred in the cafeteria and the fact that the

24  defendant wrote the victim a ticket, which the defendant then

25  destroyed.  The victim was more or less thanking the officer,

1   the defendant, for destroying the ticket.  I guess that she

2   thought that was a nice thing he did.

3   Q    How would you describe, after they discussed that, the

4   nature of their comments to one another?  Was it like a father

5   talking to a daughter or was it like two mutual friends?  Was

6   it like a mentor to a mentee?  How would you describe their --

7   the nature of those conversations?

8   A    Within a few days of chatting through the messaging on

9   Facebook, the conversation, I would say, became flirtatious.

10  There were references to the victim dancing and the defendant

11  made comments about that and there were comments about -- the

12  defendant made to the victim, something in regards to her -- he

13  didn't want her hanging out with boys.

14  Q    Did McChester ever refer to himself in any sort of

15  possessory way with respect to the victim?

16  A    In the messaging, she -- when he made reference to her --

17  his desire for her not to hang out with boys, she asked why.

18  And he made some kind of comment about, "Because I'm your

19  daddy."

20  Q    After this communications, how did they progress after the

21  initial ones?  When did it become sexual?

22  A    It became sexual, I believe, in May of 2011.  The topic

23  turned -- in the messages, the topic turned to text messages

24  the victim was going to send to the defendant after she had

25  been drinking.  The defendant was pressing the victim to reveal

1    what she wanted to text.  He asked her to call him on his cell

2    phone and the conversation led into whether or not they would

3    get together in person and mess around.

4    Q    How did you know that that messing around meant something

5    sexual in nature?

6    A    The defendant actually asked in this chain of messages

7    what she meant by messing around.  He asked her specifically,

8    "What are you referring to?  I need you to tell me."

9         She was reluctant for a few messages to say what she

10   actually wanted to say and eventually it became graphically

11   sexual.

12   Q    Did the victim state specific sexual acts that she was

13   willing to engage in with McChester?

14   A    Yes, sir.

15   Q    And what was his response to those statements by victim?

16   A    I believe he asked her for more details.  He wanted to

17   hear more from her.

18   Q    At any point did Mr. McChester offer his own thoughts and

19   ideas regarding sexual acts that he wished to perform on the

20   victim?

21   A    Yes, sir.

22   Q    And were those sexual acts explicitly described?

23   A    Yes, sir.

24   Q    And were the sexual acts that McChester wished to engage

25   in with the victim, in your opinion, were they violations of

1  Texas Sexual Assault Penal Code Statute?

2  A    Yes.

3  Q    And specifically, what types of sexual acts did

4  Mr. McChester and the victim discuss engaging in with one

5  another?

6  A    There were references made to -- comments made about

7  "throwing me around, slap my ass," making her gag.

8  Q    I guess my question is a little bit more broad than that.

9  Going back to Texas Penal Code, Section 22.011, it makes it a

10  crime to engage in sex with a minor and sex is defined as

11  contact between the penis and the vagina of a child -- or the

12  sexual organ of a child, I should say, which would, of course,

13  in this case would be the vagina of a child -- or contact

14  between the mouth of the defendant and the sexual organ of a

15  child, or contact between the mouth of the child and the sexual

16  organ of the defendant, or also contact between the sexual

17  organs of the child and/or -- excuse me, between the

18  defendant's sexual organ and the anus of the child.  Were the

19  chats -- without going into exactly what they said -- were the

20  chats explicit as to any of those acts?

21  A    Yes, sir.

22  Q    Which ones?

23  A    Specifically, I believe, there was reference -- there were

24  references made to oral sex and anal sex.

25  Q    How about vaginal sex?

1    A    Yes.  I believe there were references made to group sex,

2    as well.

3    Q    Was this a single occurrence?  You know, just one set of

4    chats on a particular day?  Or how many times did it occur

5    during this time period of communicating via Facebook between

6    May and April?

7    A    Numerous times.

8    Q    During these communications, did Mr. McChester ever

9    discuss with the child terms or specifics regarding meet

10   locations and times to engage in sexual acts with the child?

11   A    They do discuss meet and locations.

12   Q    And are there any references through the chats that

13   indicate whether or not they actually did, in fact, meet after

14   having discussed some of these locations?

15   A    Yes, sir.

16   Q    And are there references within the chats that the child

17   actually engaged in sexual acts with McChester?

18   A    Yes.

19   Q    And are those references simply made on the part of the

20   victim or are they also made on the part of Mr. McChester

21   acknowledging the sexual acts?

22   A    Both the victim and the defendant.

23   Q    During the chats, did Mr. McChester ever express any

24   concern regarding other individuals viewing or getting a hold

25   of these communications between himself and the victim?

1    A    Yes, sir.  During the course of the messages being sent

2    back and forth, the defendant did make comments on numerous

3    occasions asking if the victim was deleting the Facebook

4    messages.  He made a comment on one occasion about he did not

5    want to leave a paper trail; that they should be using the

6    phone -- telephone.  And also, there was a comment made by the

7    defendant at one point that he had to delete some of his

8    Facebook friends because they were checking.

9    Q    Specifically, did Mr. McChester refer to deleting Facebook

10   friends or deleting students who were Facebook friends?

11   A    I don't believe he specified in the message whether or not

12   they were students.  I believe he said he had to delete some

13   friends and I believe that was in reference to him deleting the

14   victim.

15          **MR. DUKE:**  Can I have a moment, please?

16          **THE COURT:**  Yes.

17       **(Pause)**

18          **MR. DUKE:**  May I approach the witness?

19          **THE COURT:**  Yes.

20   **BY MR. DUKE:**

21   Q    I just put a piece of paper in front of you.  At the top

22   it's marked 41 of 59.  Do you know what that page is?

23   A    Yes.

24   Q    What is it?

25   A    It's a copy of a list of messages sent between the victim

1    and the defendant taken from Facebook.

2    Q    And does it make reference to defendant needing to delete

3    some friends from Facebook?

4    A    Yes.

5    Q    And specifically, what does it say?

6    A    It shows the defendant saying, "Hey, have to delete some

7    students from my FB -- Facebook -- because they're checking.

8    Just wanted to let you know."

9    Q    So, earlier when you said that it wasn't specific, it just

10   said students -- I'm sorry -- just said friends, was that

11   incorrect?

12   A    Yes, it was.

13   Q    Do we know which other students Mr. McChester was

14   communicating with at this time?

15   A    No, sir.

16   Q    You said that during the chats there were references to

17   Mr. McChester wanting to communicate with a child orally, that

18   is, by telephone.  Why did he want to do that?

19   A    Those comments were made in some occasions contemporaneous

20   with comments about sexual activity or planning sexual acts or

21   I believe he wanted to use the phone in order to avoid a paper

22   trail or he kept asking, "Are you deleting these messages?"

23   Something that he -- I believe he made a comment that it was

24   something he'd rather talk to her on the phone about rather

25   than on Facebook.

1   Q    The sexual acts, did any of them occur at McChester's

2   home?

3   A    Yes, sir.

4   Q    Did the victim describe McChester's home in appearance;

5   both the outside and/or the inside?

6   A    Yes, sir.

7   Q    And through the investigation, was the victim's

8   description more or less accurate?

9   A    More or less, yes, sir.

10  Q    Do you believe based on the investigation through the

11  execution of the search warrant, as well as the descriptions

12  provided by the victim either during her CAC interview or the

13  chats on Facebook, do you have an opinion as to whether or not

14  the victim actually has been in Mr. McChester's home?

15  A    Based on her descriptions of his home, particular things

16  that she said, yes, I believe she had been in the victim's home

17  -- or, pardon me, in the defendant's home.

18  Q    After the -- let me go back.  During the CAC interview,

19  did the victim describe how many times she'd engaged in sexual

20  acts with McChester?

21  A    I believe in all she claimed seven to eight times during

22  that interview.

23  Q    And did she -- was she explicit in terms of description of

24  what type of sexual acts she engaged in?

25  A    Yes, sir.

1    Q    Did the victim make any comments regarding Mr. McChester

2    and who would see this interview that she was giving?

3    A    Yes, she did.

4    Q    What were those comments?

5    A    At certain points during the CAC interview she asked who

6    would see the videotape and, also, who would see the paper that

7    she was drawing, writing notes on.  When she was pressed for

8    details why she -- why that was a concern, she said she did not

9    want the defendant to see the video or the paper.

10   Q    After their last Facebook communication and after the

11   search warrant was executed on McChester's home, were there any

12   other communications or attempted communications between

13   McChester and the victim?

14   A    Yes.

15   Q    Describe that.

16   A    After the search warrant at Mr. McChester -- the

17   defendant's -- house on, I believe it was April 3rd, the

18   victim's mother contacted Corpus Christi Police detectives to

19   say that she had discovered two additional phones that the

20   victim had been using.  I guess those phones at some point had

21   been lost or misplaced.  They were found and the mother -- the

22   victim's mother -- contacted the police department to let them

23   know that she had found them if they wanted to come get them.

24        Detectives did go get those phones the following day.

25   I believe it was April 6th.  And when they picked up the phones

1   from the victim's mother, the victim's mother said that -- and

2   I don't know if it was on the 5th or the 6th -- the morning of

3   the 6th -- but she said that a phone call had come in to the

4   iPhone that they found -- that the mother found -- and the male

5   on the other end of the line was asking for the victim.  She

6   said, "She's not available."  The mother said, "She's not

7   available."  And she asked who it is.  This individual gave a

8   name.  It was not Robert McChester.  It was not the name Robert

9   McChester.  He gave a name, hung the phone up and shortly

10  thereafter the victim, who was present, did confirm that that

11  was the defendant that had called.

12  Q    How did she confirm that?

13  A    I don't know if it was by hearing his voice or the phone

14  number or a description that was programmed -- contact name

15  that was programmed into the phone.

16  Q    Was there any chance that the victim was mistaken as to

17  who the identity of the caller was?

18  A    I don't believe so.

19  Q    In addition to actually explicitly stating things of a

20  sexual nature during the chats, did the victim and

21  Mr. McChester attempt to hide at any point the nature of what

22  they were talking about by use of code words?

23  A    There were certain words they would use.  They referred to

24  going swimming, hang out, those terms were always in

25  parentheses; seemed to always be in parenthesis when they would

1    refer to them.  On one occasion, I believe the victim referred

2    to hanging out, in parenthesis, and in the same sentence she

3    said, "But I'm on my girly thing."  So, then there was

4    reference to something that they had previously done at a park

5    in Corpus Christi.  And she asked, "Do you want to do the same

6    thing we did at this park?"

7            And the defendant said, "Yeah.  That's fine.  We can

8    do the same thing we did at the park."

9    Q    The -- sorry, I lost my train of thought.

10           During the execution of the search warrant --

11   actually, let me go back and ask a different question.

12           The communications discussing sexual acts between the

13   victim and McChester, did it reference the use of any police

14   equipment as part of those sexual acts?

15   A    Yes, sir.

16   Q    Did it reference the use of -- actually, I'm not going to

17   ask that.

18           During the execution of the search warrant, was

19   Mr. McChester found to be in possession of any items that he

20   should not have been found in possession of?  Related to his

21   duties as a police officer?

22   A    I believe there were numerous identification documents;

23   Texas driver's license or ID cards found on his dresser in the

24   bedroom.

25   Q    And to your knowledge, is he allowed to keep the ID cards

1    of the people he pulls over?

2    A    I don't know exactly what the Corpus Christi Police

3    Department's policy about that is, but I was told that those

4    identification documents there is a procedure they have in

5    place in order to get the identification documents back to the

6    owner and that's through the department.  If an officer were to

7    keep, by accident, say a driver's license or an ID document --

8    identification document -- they have some procedure in place to

9    get those documents back to the owner.

10   Q    And how many IDs did Mr. McChester have in his home?

11   A    Based on the photographs, probably around ten.

12   Q    And did those IDs consist of -- any of them consist of

13   children?

14   A    There were some identification documents of individuals

15   that were under 21.  However, I don't know the ages of all

16   those individuals.

17   Q    Do you know whether or not Mr. McChester has previously

18   been disciplined for keeping motorists' or people he encounters

19   identifications?

20   A    It's my understanding he has been disciplined in the past

21   for keeping identification documents.

22        **(Pause)**

23   Q    Did the victim state whether or not she was afraid of

24   Mr. McChester seeing her interview and/or the notes she made at

25   the CAC?

1   A    Yes, sir, she did make that comment.

2        **MR. DUKE:**  I'll pass the witness.

3        **THE COURT:**  Mr. Gould?

4        **MR. GOULD:**  Thank you, your Honor.  Just for the

5   record, I wasn't sure, your Honor, are we rolling everything

6   into one?

7        **THE COURT:**  Are you going to be wanting to put on

8   additional testimony on the detention phase of the case?

9        **MR. DUKE:**  I don't think so, your Honor.

10       **THE COURT:**  Okay.  There you go.

11                     **CROSS EXAMINATION**

12  **BY MR. GOULD:**

13  Q    Mr. Odom, good morning.  My name is Keith Gould.  I

14  represent Mr. McChester.  I've got a few questions for you.

15       **THE COURT:**  Can I ask a couple of questions that I

16  just want to get out of the way?  How old was the victim?  You

17  may have said it, but I forgot?

18       **THE WITNESS:**  At the time the relationship started,

19  your Honor, I believe she was 14.

20       **THE COURT:**  Okay.  So, that would make her about 15

21  now?

22       **THE WITNESS:**  Yes.

23       **THE COURT:**  And what offenses could Mr. McChester be

24  punished for under state law?

25       **THE WITNESS:**  I believe for sexual contact.  I don't

1  know the law exactly, but sexual contact with a minor.

2            **THE COURT**:  Okay.  Thank you.

3            **MR. DUKE**:  Your Honor, it's sexual assault.  It's

4  Texas Penal Code Section 22.011.

5            **THE COURT**:  Thank you.

6            All right.  Go ahead, Mr. Gould.

7            **MR. GOULD**:  Thank you, your Honor.

8  **BY MR. GOULD**:

9  Q    I have some questions for you in light of your earlier

10 testimony.  You had mentioned that -- the word interstate

11 commerce.

12 A    Yes.

13 Q    Can you tell me how you -- your understanding of how

14 interstate commerce applies to this particular case?

15 A    It --

16           **MR. DUKE**:  Your Honor, I'm going to object to that as

17 a question regarding the law with respect to interstate

18 commerce.  He's to testify about the facts, not the legal

19 analysis of those facts.

20           **MR. GOULD**:  Maybe I can clarify the question, your

21 Honor.

22 **BY MR. GOULD**:

23 Q    I'm not asking you about the law or the legal definition

24 of interstate commerce, but what facts or factors in this case

25 lead you to your conclusion that interstate commerce was

1   affected by these alleged actions?

2   A    Well, the Facebook servers that -- actual servers that run

3   Facebook are located in California, if I'm not mistaken.  Cell

4   phones use land lines in actuality that transmit signals.

5   Therefore, interstate commerce is affected.

6   Q    Okay.  Now, the cell phone of the alleged victim in this

7   case, who was her provider?

8   A    I believe it was AT and T.

9   Q    Are you sure?  Or do you believe?

10  A    That was a comment she made during her interview.  I

11  believe the interviewer asked, "Who was your cell phone

12  carrier," and she said, "AT and T."

13  Q    Other than her statement to you, were you able to

14  independently verify who her cell phone carrier was?

15  A    Not yet, no, sir.

16  Q    Have you -- do you have any verification as to

17  Mr. McChester's cell phone providers?

18  A    Not yet, no, sir.

19  Q    Have you seized any cell phones of Mr. McChester?

20  A    Actually yes, sir.  We have seized a T-Mobile phone that

21  belonged to Mr. McChester.

22  Q    Okay.  Have you -- I believe you said you haven't done any

23  forensic analysis of that cell phone?

24  A    I don't have the results yet, sir.

25  Q    So, you can't tell us today that you found anything on any

 1   cell phone of Mr. McChester's that would corroborate the

 2   alleged victim's testimony?

 3   A    I don't have any of that information yet, no, sir.

 4   Q    Okay.  Likewise, you don't have any information to share

 5   with us regarding information you may have taken from

 6   Mr. McChester's laptop?

 7   A    No, sir, I don't have those results back, either.

 8   Q    Okay.  Do you have any information from Facebook that

 9   you've subpoenaed from them regarding any accounts that you

10   believe may be owned or operated by Mr. McChester?

11   A    I do not have that information yet, sir.

12   Q    Okay.  So, the Facebook information that you're testifying

13   about today and information that was shown to you by Mr. Duke,

14   where did you get that information from?

15   A    That information came from the computer in the victim's

16   home.

17   Q    Okay.  So, the only information you have -- if I

18   understand this right regarding Facebook chat -- is from the

19   victim's home?  Her computer and her testimony?

20   A    Yes, sir.  She provided passwords and user names to access

21   Facebook which the detectives were able to do and that

22   information was accessed and printed out --

23   Q    Okay.

24   A    -- from her Facebook account.

25   Q    And she was able to provide her access information and you

1   were able to access her Facebook account, correct?

2   A    That's correct.

3   Q    Were you able to access Mr. McChester's Facebook account?

4   A    No, sir.

5   Q    Do you have any way to know 100 percent sure that the

6   person she was chatting with was Robert McChester, in fact?

7   A    Other than comments made during the messages.  His name

8   would show up on the chats, on the messages that are referenced

9   to him being a police officer at her school.

10  Q    You don't have any way to tell us with any degree of

11  certainty today that the person on the other end of that chat

12  was, in fact, Robert McChester?  It could have been somebody

13  else, correct?

14  A    Other than her identifying the comments made between them

15  about the things that occurred at school that we've been able

16  to verify; comments made about his house, describing the house.

17  Q    The question, sir, was she was talking to somebody.

18  A    Yes, sir.

19  Q    And she believes it was Robert McChester.

20  A    Yes, sir.

21  Q    It could, in fact, have been somebody else who was using

22  Robert McChester's account or an account under Robert

23  McChester's name, correct?

24  A    Could have been.

25  Q    Could have been a student?  Could have been another adult?

1          **MR. DUKE:**  Your Honor, I'll object to this line of

2    questioning as pure speculation.

3          **MR. GOULD:**  Your Honor, it's no more speculation than

4    him telling the Court that it was definitely Robert  McChester

5    on the other side of that conversation.  He doesn't know.

6          **THE COURT:**  I get your point.  The victim said it

7    was.  That's all we know.

8          **MR. GOULD:**  That's all we know.

9          **THE COURT:**  At this point.  I get the point.  Okay.

10   Let's move on.

11         **MR. GOULD:**  Okay.

12   **BY MR. GOULD:**

13   Q    And you would agree with Judge Ellington that that is all

14   was know is what the victim told you, correct?

15   A    Yes.

16   Q    Now, when this victim first appeared at Spohn Memorial

17   Hospital on April 3rd, 2012 --

18   A    Yes, sir.

19   Q    -- what was the reason that she appeared at the Emergency

20   Room?

21   A    I believe she was intoxicated.  Her mother took her to the

22   hospital or had an ambulance take her to the hospital to have

23   her evaluated.

24   Q    In fact, it was acute alcohol intoxication was the

25   diagnosis?

1   A    I haven't seen the medical records.  I don't know what the

2   diagnosis was.  It's my understanding it was due to alcohol

3   consumption.

4   Q    Okay.  Did you talk to a nurse?  Nurse Maxey?

5   A    A Corpus Christi Police detective did talk to Nurse Maxey.

6   Q    Okay.  Did she say it was the fault of a man whose first

7   name started with an R?

8   A    Yes.

9   Q    And you said that she was able to immediately identify

10  Robert McChester earlier?

11  A    She said that his name started with an R and then Mc-

12  something, I believe is what she referred to in the beginning.

13  Q    But she didn't say Mc-something, did she?

14  A    At that moment she did not.  I believe later she

15  identified the defendant.

16  Q    She said Mc-fucking-something, correct?

17  A    Yes.  I believe she said both Mc-something or Mc-fucking-

18  something.

19  Q    Were you able to determine through your investigation how

20  intoxicated she was at the time she made the statement?

21  A    I don't know how intoxicated she was, no, sir.

22  Q    Do you think that would have been something important for

23  you to know?

24  A    I imagine the medical records will show.  I haven't seen

25  the medical records to see how much alcohol she had in her

 1  system.

 2  Q    Now, you've testified earlier that you -- or a search

 3  warrant was executed at Mr. McChester's home?

 4  A    Yes, sir.

 5  Q    And you said that some laptops and some phones were seized

 6  and you believe that his truck was seized, as well?

 7  A    Yes, sir.

 8  Q    Have you found any evidence on the laptops to link

 9  Mr. McChester with any of these alleged offenses?

10  A    I don't have the analysis back from those computers.

11  Q    Okay.  And likewise, you haven't found any evidence on the

12  phones which you can share with us today which would link him

13  to any crime, do you?

14  A    Again, I don't have the analysis back on the phones,

15  either.

16  Q    Okay.  And likewise, you don't have any evidence that may

17  or may not have been found in the truck to share with us today

18  that could help your case, do you?

19  A    Other than the victim describing the truck -- seats in the

20  truck that matched the description of the defendant's truck.

21  Q    Okay.

22  A    I don't believe anything was found inside the truck.

23  Q    Did you ask the victim if she may have seen his truck in

24  the parking lot at the school?

25  A    I haven't asked her that.

 1  Q    Do you think she might have?

 2  A    Possible.

 3  Q    I'm sorry?

 4  A    Possible.

 5  Q    Okay.

 6  A    Well, if he takes his private vehicle to work then it's

 7  possible.

 8  Q    Okay.  Did you do any investigation, ask the principal or

 9  any of the teachers where Mr. McChester may have parked at the

10  school?

11  A    No, sir, I haven't asked.

12  Q    You haven't followed up on that?

13  A    No, sir, not yet.

14  Q    You testified earlier that you had evidence of

15  communications between my client and the victim -- by the way,

16  do you know the victim's birth date?

17  A    Not offhand, I don't.

18  Q    Would you have any documents or records with you that

19  might help you?

20  A    I don't have any here.

21        **MR. DUKE:**  Your Honor, I would object to that

22  question.

23        **THE COURT:**  Not on the record.  He can give us the

24  birth month and the birth year if he's got it.

25  //

1   **BY MR. GOULD:**

2   Q    Do you know the birth month and the birth year?

3   A    No, sir, I don't.

4   Q    Okay.  But you know she's 15?

5   A    I believe so, yes, sir.

6   Q    You indicated earlier that there were voice, text and ISP

7   messages or communications --

8   A    Yes, sir.

9   Q    -- between these two.  I think I asked you earlier about

10  the voice communications and you told us you didn't know who

11  the cellular service providers were, correct?

12  A    I believe he has a T-Mobile and she had an AT and T for

13  their cell phones.

14  Q    Okay.  Do you have any evidence from -- or documentation

15  from -- AT or T or T-Mobile to show the Court that these

16  communications were actually made between the two phones?

17  A    Don't have those results yet.

18  Q    Okay.  Do you have any recordings of the phone

19  conversations?

20  A    No, sir.

21  Q    As far as the text message providers, would those be the

22  same providers?

23  A    I believe so, yes, sir.

24  Q    Okay.  And again, you don't have any evidence or

25  documentation other than the victim's -- or the alleged

 1   victim's -- statement that would help us with that, do you?

 2   A     I don't have those results back.

 3   Q     As far as the Internet service providers, can you tell us

 4   who the ISPs-- Internet service providers -- were for either

 5   Mr. McChester or the alleged victim at the time of the offense?

 6   A     I don't have that information with me.

 7   Q     Okay.  Do you know who they are?

 8   A     I believe the Corpus Christi Police Department has reached

 9   out to them.  I don't know personally who the Internet service

10   providers are for either defendant or the victim.

11   Q     And likewise, you don't have any documentation from them

12   which would confirm or corroborate the alleged victim's story?

13   A     Not with me, no, sir.

14   Q     You talked earlier about how this alleged victim got

15   Robert McChester's information from a person named -- it was

16   Sam?

17   A     Yes, sir.

18   Q     Okay.  And have you ever talked to Sam?

19   A     Not yet, no, sir.

20   Q     Has anyone interviewed Sam?

21   A     I don't believe so, no, sir.

22   Q     And you're not telling the Court today that Robert

23   McChester has done anything improper with regards to Sam, are

24   you?

25   A     I don't have any information.

1  Q    In fact, you don't have any information that Robert

2  McChester has done anything improper with any other minor in

3  the world except for this particular alleged victim, correct?

4  A    That's correct.

5  Q    You made reference to a statement that you saw on, I

6  think, a Facebook chat, "I'm your daddy."  Do you recall that?

7  A    Yes, sir.

8  Q    I don't see that in your affidavit.  Is that something

9  that came up after you drafted the affidavit or --?

10  A    There were a number of comments that weren't included in

11  the affidavit.  That was one of them.

12  Q    Okay.  But that was not one of the comments.

13  A    That was not one of the comments put in the affidavit.

14  Q    Okay.  Is there some particular importance to that

15  statement that you were compelled to testify to it today?

16  A    I don't believe -- could you repeat the question?

17  Q    I'm just wondering why you testified to this statement

18  that's not included in your probable cause affidavit and why

19  you feel that's an important statement?

20  A    Well, I believe that's an important statement because when

21  the conversations became flirty and references were made to the

22  victim associating with boys at the school, dancing, the

23  defendant made comments that he doesn't want her spending time

24  with boys.  She asked why and he said, "I'm your daddy," which

25  seemed inappropriate.

1    Q    There was some testimony that there may have been sexual

2    activity between these two people.  Was this girl subject to a

3    SANE examination?  Do you know what that is?

4    A    A SANE examination?

5    Q    Yes.  A -- it's a sexual assault nurse examination.

6    A    I don't know if she was or not.

7    Q    Okay.  Is there any medical or other forensic evidence

8    that you're aware of that would show that this girl was

9    sexually assaulted or had had sex?

10   A    Not that I'm aware of.

11   Q    Is there any evidence regarding sexual activity that you

12   know of besides her word or her statement to you?

13   A    No.

14   Q    You mentioned earlier that she had given a description of

15   Mr. McChester's home and that you thought it was more or less

16   accurate?

17   A    She described the color of the house, the layout of the

18   furniture inside his bedroom, certain items that she saw inside

19   the home.

20   Q    Which items would those be?

21   A    Television, some kind of a gun -- I believe it was a

22   shotgun/rifle, some kind of a long gun that she remembered

23   seeing in the house, sheet color, where the bathroom was

24   located.  I believe she said she didn't go into any of the

25   other rooms other than she said when you came in the front door

 1  the kitchen was right in front of you, where the bedroom was

 2  located, how the furniture was arranged in the bedroom.

 3  Q    As far as the layout of the house, were you -- did you go

 4  to the house?

 5  A    I haven't been inside the house.

 6  Q    Are you familiar with the layout of the house?

 7  A    I've seen photographs taken when the search warrant was

 8  executed at the defendant's house.

 9  Q    Okay.  From the front door, what can you see as far as the

10  inside of the house?

11  A    I believe when you come in the front door it opens to the

12  living room area and the kitchen is directly on the other side

13  of the living room area.

14  Q    Okay.  Can you see any of the bedrooms?

15  A    There's a -- I believe a small hallway that leads to the

16  bedrooms.

17  Q    Do you have any pictures with you of the --

18  A    I don't have any.

19  Q    -- of the home?

20  A    Here on the stand with me, no, sir.

21  Q    Okay.  But pictures were taken at the --

22  A    Yes.

23  Q    -- at the time of the search?

24  A    Yes, sir.

25  Q    And those would be in the possession of CCPD do you think?

1   A    Yes, sir, they have them.

2   Q    This girl claimed that there were, I think you testified,

3   seven sexual encounters?

4   A    Seven to eight, I believe.

5   Q    Seven to eight?

6   A    Yes, sir.

7   Q    Have you been able to independently corroborate the time

8   and/or place of these alleged encounters?

9   A    No, sir.

10  Q    Have you -- is that currently being investigated?

11  A    Yes.

12  Q    Okay.  And does that investigation also take into

13  consideration Mr. McChester's work schedules as a police

14  officer?

15  A    It will be taken into account, yes, sir.

16  Q    Okay.  And do you know anything at all about that?

17  A    About his work schedule?

18  Q    About how his work schedule either corroborates or does

19  not corroborate the statements of the girl regarding their

20  sexual encounters?

21  A    No, if you read some of the messages he refers to the fact

22  that he's on -- at work and on duty when he's talking to her

23  through Facebook.

24  Q    Okay.  Do any of the messages or evidence that you've

25  gathered to date indicate that Mr. McChester was on duty at the

1   time of the encounters?

2   A    I haven't seen the work schedule from the Corpus Christi

3   Police Department to determine if they correspond.

4   Q    Okay.  Is that something you're looking into?

5   A    Yes, sir.

6   Q    You don't have any evidence to that at this point or any

7   corroboration?

8   A    To date, no, sir, I don't.

9   Q    Did you make the arrest of Mr. McChester the other day?

10  A    Yes, sir.

11  Q    Okay.  And you understand that he voluntarily turned

12  himself in?

13  A    That was my understanding.

14  Q    Okay.  In fact, you arrested him at my office.

15  A    Yes, sir, outside your office.

16  Q    Okay.  And that was a voluntary arrest.  You didn't have

17  to apprehend him, correct?

18  A    I wasn't in the office when the Corpus Christi Police

19  Department first made contact with the defendant in your

20  office.  When I first saw him, he was standing on the sidewalk

21  with the Corpus Christi Police officers.

22  Q    And you understand this; he did voluntarily turn himself

23  in, correct?

24  A    Yes, sir.

25  Q    The -- you were asked a number of questions by Mr. Duke

1   regarding some identification documents you found in

2   Mr. McChester's house.  These were driver's licenses?

3   A    I believe so, yes, sir.

4   Q    Okay.  And do you think that some may have been under 21?

5   A    Yes, sir.

6   Q    But you're not sure of the exact ages or dates, are you?

7   A    No.  I don't know the exact ages or dates.

8   Q    And you're not telling the Court that that is some type of

9   offense, crime or rule infraction that you know of for him to

10  have those, are you?

11  A    Based on what I was told that he had been reprimanded in

12  the past for keeping identification documents.

13  Q    The question is do -- can you cite or quote a rule or

14  regulation that might have been violated as a result of him

15  having these identification cards?

16  A    No, sir.

17  Q    In fact, he could have seized those cards that very day

18  and was waiting to turn them in the very next work day when he

19  reported for duty, correct?

20  A    Yes, sir.

21  Q    And certainly that's not a rule violation or a crime that

22  you know of.

23  A    Not that I know if, no.

24  Q    Have you done any background on the victim of this case?

25  A    What do you mean by background?

1   Q    Background, have you determined whether she has mental

2   issues?

3   A    I have not.

4   Q    Have you looked into whether she's been to rehab and how

5   many times?

6   A    I believe I've learned of one time she was in a

7   rehabilitation center.

8   Q    Do you know where she went?

9   A    I want to say it was Laredo.

10  Q    Laredo?

11  A    I believe so.

12  Q    Do you remember the name of the place?

13  A    No, sir.

14  Q    Did you check her criminal history?

15  A    I did not.

16  Q    Or did the officer?

17  A    I did not.  The Corpus Christi Police Department, I

18  believe, did.

19  Q    In your affidavit there's some indications that she had

20  pictures on her phone of her having engaged in sexual acts with

21  other people?

22  A    Pictures on her phone of her engaged in other acts?

23  Q    Sexual acts with people other than Robert McChester?

24  A    I don't believe I testified to that, no, sir.

25  Q    Give me just a second.

1          Can I approach, your Honor?

2          **THE COURT:**  Yes.

3  **BY MR. GOULD:**

4  Q    It's the second to the last page.  It's under KC; it's the

5  first line.

6  A    Second to the last?

7  Q    I'm sorry, yes.

8          **THE COURT:**  What are you having him look at,

9  Mr. Gould?  What's he looking at?

10         **MR. GOULD:**  He's looking at the second to the last

11  page of the affidavit, your Honor.

12         **THE COURT:**  Of the complaint affidavit?

13         **MR. GOULD:**  First line of the complaint --

14         **THE COURT:**  Okay.

15         **MR. GOULD:**  -- and affidavit.

16         **THE WITNESS:**  Starting here at the top?

17  **BY MR. GOULD:**

18  Q    First sentence.

19  A    I read it.  Would you like for me to read it out loud?

20  Q    Yeah, sure.

21  A    Okay.  The victim says, "I have another pic -- not boobs -

22  - but me doing something to someone, but I can't put that shit

23  on Facebook."

24  Q    Were you able to retrieve those pictures from her cell

25  phone?

1  A    I don't have the analysis back on her phone, yet.  So, no,

2  sir, I haven't been able to get that information.

3           **MR. GOULD:**  Thank you, sir.

4           Pass the witness, your Honor.

5           **THE COURT**:  Mr. Duke, any redirect?

6                      **REDIRECT EXAMINATION**

7  **BY MR. DUKE:**

8  Q    The thing about the ID cards, I think you were asked

9  whether there was a violation or a rule violation and asked, I

10 guess, to cite the particular section.  Do you recall that?

11 A    Yes, sir.

12 Q    Have you talked to the police about this?

13 A    Yes, sir.

14 Q    According to what your conversation with the police was,

15 is Mr. McChester permitted to keep peoples' driver's licenses

16 and ID cards?

17 A    I don't believe so.

18 Q    And you said he was reprimanded for having done this in

19 the past, according to your conversations with the police?

20 A    I used the term reprimanded.  I'm not sure exactly what

21 happened, but I know that he was -- it was discussed before

22 about him keeping identification documents.

23 Q    So, while it may not be a violation of the Texas Penal

24 Code, did you understand it to be a violation of his duties as

25 a police officer?

1    A    I understood it to be a violation of the internal policies

2    of the Corpus Christi Police Department.

3    Q    In addition to the things that were described -- the

4    shotgun or long gun, the layout of the house -- you were asked

5    if there were any other items that were discovered in the home

6    that were otherwise referenced in the chats.  Was the use of

7    sexual devices, what we would call sex toys, was there a

8    reference in the chats?

9    A    I believe it was a reference to what I believe to be a sex

10   toy that was referred to in the messages between the victim and

11   the defendant.

12   Q    Was there any sex toys found in Mr. McChester's home?

13   A    Yes, sir.

14   Q    Now, when the victim said she met with Mr. McChester and

15   they engaged in sexual acts, did he wear a mask?

16   A    I don't believe so, no, sir.

17   Q    Did he otherwise try to hide or cover his identity?

18   A    I don't believe so, no, sir.

19   Q    So, do you have any reason to disbelieve the victim's

20   account that she was able to recognize McChester as the person

21   she met and engaged in sexual acts with?

22   A    No, I believe her.

23            **MR. DUKE:**  Pass the witness.

24            **MR. GOULD:**  No further questions.

25            **THE COURT:**  Thank you, sir.  You may step down.

1    **(Witness excused at 11:23 a.m.)**

2           Do you have any other witnesses?

3           **MR. DUKE:**  Not at this time, your Honor.

4           **THE COURT:**  Witnesses on probable cause, Mr. Gould?

5           **MR. GOULD:**  I have no witnesses on the probable cause

6    issue.

7           **THE COURT:**  I'm sorry.  Did you say no --

8           **MR. GOULD:**  I have no witnesses --

9           **THE COURT:**  -- no witnesses?

10          **MR. GOULD:**  -- on the probable cause issue.

11          **THE COURT:**  Okay.  All right.  So, both parties

12   close.  Mr. Duke, argument?

13          **MR. DUKE:**  Your Honor, I'll waive argument.

14          **THE COURT:**  All right.  And Mr. Gould?

15          **MR. GOULD:**  Your Honor, just very briefly.  I think

16   there are some issues as to identifying my client as the

17   initiator or the person who was actually on the other end of

18   the Facebook account.  They haven't proved it was him.  They

19   proved that there was an account with his name on it and I

20   think that's all they've proved at this point.  So, we'd ask

21   the Court to consider that in making the initial determination.

22          **THE COURT:**  Mr. McChester, would you stand, please?

23          **THE DEFENDANT:**  Yes, ma'am.

24          **THE COURT:**  Mr. McChester, I do find that there is

25   probable cause to believe that you committed the offense

1    alleged in the criminal complaint.  I heard sworn testimony

2    that a juvenile victim stated that she had had phone

3    conversations with you and text messaging involving the

4    commission of sexual acts and a communication through the

5    Facebook account.

6          And as a matter of law, even though those things

7    occurred all here in -- probably all here in Nueces County --

8    it's really a matter of law that these involve the use of

9    interstate commerce.  And so, I do find that there is ample

10   probable cause in the case.

11          It's not for me at this stage of the case to question

12   the veracity of the victim's testimony.  I have no evidence to

13   indicate that what she said was not true and she has identified

14   you as the person that she received these text messages from.

15   And there is some corroborating evidence, as well.  So, I'm

16   going to find that there is probable cause to believe that you

17   committed the offense alleged in the criminal complaint.

18          Now, on the issue of detention, Mr. Duke, I have the

19   pretrial report.  Did you have any additional testimony or

20   proffers that you would like to put on?

21          **MR. DUKE:**  No additional testimony or proffers, your

22   Honor.

23          **THE COURT:**  Okay.  And Mr. Gould?  Testimony,

24   proffers?

25          **MR. GOULD:**  We just ask the Court to adopt the

1  Pretrial Services report, your Honor.  I would like to ask

2  probably four questions of my client and I'd like to limit his

3  testimony strictly to the 3142(g) factors.  He's not going to

4  go into any other areas than that.

5          **THE COURT:**  All right.  Mr. McChester -- you want to

6  call your client to the stand, then?

7          **MR. GOULD:**  Yes, your Honor.

8          **THE COURT:**  Okay.  Mr. McChester, would you come

9  forward and raise your right hand to be sworn, sir?

10          **ROBERT L. MC CHESTER, JR., DEFENDANT, SWORN**

11          **THE COURT:**  Mr. McChester, come -- I want you to be

12  seated up in the witness box.  Mr. McChester, for the record,

13  what is your name, sir?

14          **THE WITNESS:**  I'm sorry?

15          **THE COURT:**  What is your name, sir?

16          **THE WITNESS:**  Robert Lee McChester, Jr.

17          **THE COURT:**  You're the defendant in this case?

18          **THE WITNESS:**  Yes.

19          **THE COURT:**  And when you appeared in front of me a

20  few days ago I told you that you had the right to remain silent

21  and the right to make no statements or comments about the facts

22  of this case.  Do you recall that?

23          **THE WITNESS:**  Yes, ma'am.

24          **THE COURT:**  All right.  Your lawyer says he wants to

25  call you on the stand to testify about bond matters limited to

1  certain particular areas.  Have you discussed this with your

2  attorney?

3          **THE WITNESS:**  Yes, I did.

4          **THE COURT:**  And do you understand, Mr. McChester,

5  that this is generally not recommended because in your answers

6  or in the questions asked by your attorney you could

7  inadvertently open the door to be further questioned?  In other

8  words, Mr. Duke is going to have the right to cross examine you

9  about any matter -- any matter -- that you talk about here on

10 the stand and if you open the door or your attorney opens the

11 door, then Mr. Duke is going to be free to cross examine you

12 regarding these matters.  Do you understand that?

13         **THE WITNESS:**  That's in reference to the questions my

14 attorney asks me?

15         **THE COURT:**  Or answers that you give.

16         **THE WITNESS:**  Yes.

17         **THE COURT:**  Have you discussed this with your lawyer?

18         **THE WITNESS:**  Yes, ma'am.

19         **THE COURT:**  All right.  And you -- Mr. Duke?

20         **MR. DUKE:**  Your Honor, I just want to have a moment

21 with Mr. Gould, if I might.

22         **THE COURT:**  Uh-huh.

23     **(Pause; Attorneys confer)**

24         **MR. GOULD:**  Your Honor, could we have a clarification

25 before I begin?

1        **THE COURT:**  A clarification from me?

2        **MR. GOULD:**  From the Court --

3        **THE COURT:**  Sure.

4        **MR. GOULD:**  -- maybe an advanced ruling.

5        **THE COURT:**  Uh-huh.

6        **MR. GOULD:**  My intent in asking some limited

7   questions are going to be strictly about family ties, length of

8   residence, community ties, past conduct; that type of thing.

9   Mr. Duke has indicated he'll be asking about the facts and

10  circumstances of the case, which is something that's under

11  3142(g).

12       I don't intend to go into those areas, but I'd

13  certainly object to Mr. Duke getting into areas that I don't go

14  into.  And so, I'm interested if the Court would allow inquiry

15  into those areas.

16       **THE COURT:**  Mr. Duke?

17       **MR. DUKE:**  Your Honor, I believe I'm permitted to go

18  into anything that is the factors to be considered by the Court

19  under 3142(g) and they do include the nature and circumstances

20  of the offense charged, the weight of the evidence against the

21  person, the history and characteristics, seriousness or danger

22  -- all this stuff he's going to be testifying.

23       **THE COURT:**  Do you have some case that says that I

24  can allow you to question him about the offense?  I mean, I

25  understand those are things that I have to take into

1    consideration.  But do you have a case that says that I can --

2    that you can cross examine him about those matters if the door

3    is not opened by your attorney?

4           **MR. DUKE:**  Your Honor, I don't know how I can't be --

5    I don't know what I -- excuse me.  Let me say it like this.  I

6    don't know why I should be prohibited from making inquiries

7    into areas of consideration that the Court is required to

8    consider.  I mean, I can couch my questions, I'm positive, in

9    ways that would cause them to be answered as to the detention

10   issues.

11          What I would propose in an effort to protect

12   defendant is I'm not opposed to defense counsel proffering his

13   testimony with respect to whatever these questions are.  But I

14   believe if he stands up there and takes the stand, then I am

15   permitted to question about anything that's relevant to the

16   detention issue.

17          If Mr. Gould would like to suggest a proffer to me --

18          **MR. GOULD:**  Your Honor, if --

19          **MR. DUKE:**  -- more than likely I would not be opposed

20   to how long he's been living in the community, whether or not

21   he has, you know, been disciplined this way or that.  I don't

22   have an issue with that.  This Court knows that we regularly do

23   that.  But I believe that Mr. Gould does not get to limit my

24   cross examination to what he asks.  That's not the nature of

25   cross examination.

1       **MR. GOULD:**  Your Honor, I do disagree.  I think that

2   questions that go beyond the scope of direct are always

3   objectionable.  However, if Mr. Duke is agreeing to not object

4   to a proffer on those issues --

5       **THE COURT:**  The statute allows for a proffer.

6       **MR. GOULD:**  -- that's probably a better way to do it.

7       **THE COURT:**  Even if he were objecting, I'd allow you

8   to make a proffer.  I would recommend that that's what you do.

9   I will not let Mr. Duke cross examine about the offense because

10  I don't know of any case that says he can do that.

11      But at the same time I've been in these -- I've been

12  hearing these cases for a long time and it's very easy with a

13  slip of the tongue to bring up the issue.  All your client has

14  to do is say, "I've," you know, "I don't have sex with minors,"

15  or anything like that and he's going to open the door just by

16  saying -- by some answer.  That's why it's not recommended that

17  these guys testify.

18      But I'm going to let Mr. Duke cross examine about

19  anything that your client might infer and I will accept a

20  proffer if you want to do that instead.

21      **MR. GOULD:**  Your Honor, I'd prefer to do a proffer

22  and I'll recall my client from the stand.

23      **THE COURT:**  Okay.  Mr. McChester, you may step down.

24  Thank you, sir.

25      All right.  Your proffer, Mr. Gould.

1    **MR. GOULD:** Your Honor, the proffer is if my client

2  were called to the stand under oath to testify --

3    **THE COURT:** Let's -- let me get him down there. That

4  chain rattling is hard on the record.

5    **(Pause)**

6         Yes. Go ahead, Mr. Gould.

7    **MR. GOULD:** Briefly, your Honor, my client would

8  testify that he has a clean criminal record. He has no

9  criminal history. He received a speeding ticket, I believe, in

10  2002. He is a -- or since he resigned yesterday -- was a

11  Corpus Christi Police officer for almost five years. He has

12  never been formally disciplined, reprimanded or otherwise by

13  the police department while he was a serving officer.

14         He has lived in Corpus Christi his entire life. His

15  mother and father have lived in Corpus Christi their entire

16  lives, as well as family before them. His father has been

17  employed by CCAD for almost 40 years. His mother has been

18  employed for almost 20 years at the Corpus Christi State

19  School.

20         My client is a graduate of Roy Miller High School

21  where he was ranked number 30th in his graduating class. He

22  was a standout football and track star. He played on the golf

23  team and was involved heavily in school activities.

24         He has, along with his family, deep roots with the

25  community. He has no history of drug or alcohol abuse. He

1    did, in fact, turn himself in voluntarily as soon as he became

2    aware that there was a warrant out.  We made arrangements and

3    he was happy to do that.

4            That is the proffer of the testimony that he would

5    give, your Honor.

6            **THE COURT**:  Okay.  Thank you.

7            **MR. DUKE**:  I have no objection to that, your Honor,

8    for the record.

9            **THE COURT**:  The proffer is accepted.  Anything else,

10   Mr. Gould?  I'm going to hear argument in a minute, but we'll

11   let Mr. Duke start on that.

12           **MR. GOULD**:  Nothing further, your Honor.

13           **THE COURT**:  Okay.  Thank you, Mr. Gould.

14           Mr. Duke, argument?

15           **MR. DUKE**:  Well, your Honor, first I would argue that

16   under 18, 3142 subsection (e) -- (3)(e), I should say, this is

17   an offense involving a minor victim under Section 2422 of Title

18   18 and this charge infers a rebuttable presumption that no bond

19   can be made -- or, I'm sorry -- I mis-cited the section.  It's

20   actually 31 -- no, I got it right, 3142(e).  That there's a

21   rebuttable presumption that bond is not appropriate in these

22   cases because they cannot assure the safety of the community or

23   the flight risk.  And I would argue that that presumption has

24   not been rebutted.

25           To the extent that the Court believes that

1   presumption has been rebutted, I believe, in complete and total

2   disagreement with Pretrial Services that no bond can safely

3   guarantee the appearance of Mr. McChester to court or the

4   safety of the community.

5           This is an offense which carries a mandatory minimum

6   of ten years imprisonment.  It's a very long time for a first

7   offense and one that would certainly suggest to an individual

8   that they may want to consider fleeing to avoid prosecution.

9           With respect to the danger to the community, which is

10  my stronger argument, Mr. McChester is a child rapist.  He

11  raped a child seven or eight times.

12          **MR. GOULD:**  Your Honor, I'm going to object to that.

13          **THE COURT:**  Objection's overruled.

14          **MR. GOULD:**  Thank you.

15          **THE COURT:**  It's argument, Mr. Gould.

16          Go ahead, Mr. Duke.

17          **MR. DUKE:**  Over a period of approximately one year he

18  used his influence and position of trust as a security officer,

19  an off-duty police officer working as a security officer at

20  Tuloso-Midway High School, in order to gain access to children

21  in general and this child in particular.  And then, when

22  confronted, albeit, by the child's initial contacting him on

23  Facebook, he began a dialogue with that child that was

24  flirtatious in nature and then rose to the level of explicit

25  sexual discussions; and then further rose to the level of

1    expressing desires to engage in, set up meetings to actually,

2    in fact, engage in sexual acts with a child and then attempting

3    to cover his tracks as best he could by encouraging the child

4    to destroy evidence.

5              He also attempted to avoid detection by moving some

6    of their communications to a different means -- oral

7    communications -- which otherwise would not be reported.

8              There is reference by Mr. McChester who, according to

9    the victim, is the other person on the end of those chats, that

10   he has been communicating with other children; the original

11   child Sam and then his strange comment that he had to delete

12   students from his Facebook because they were checking on him.

13             We don't know how many children he may continue to be

14   communicating with in the community.  We only know of this one

15   particular one and we further know that this particular one,

16   even when the jig was up, so to speak, and law enforcement had

17   come to his house, had made him aware of their investigation of

18   him, he attempted to contact the number one witness in this

19   case; for what purpose, I don't know.  But the

20   inappropriateness of it is certainly there and you couple that

21   with the fact that the child during her CAC interview expressed

22   fear of Mr. McChester finding out about her speaking to law

23   enforcement about the illegal acts that they engaged in, I

24   think there is an ongoing danger to the community with respect

25   to that child.

1        This is the most serious offense.  Perhaps the only

2   thing that would be more serious would be child murder with

3   respect to multiple occasions of sexually assaulting a child.

4   And I believe that these open ended questions as to who all

5   he's communicating with, who he might continue to communicate

6   with is knowledge and ability as a police officer with respect

7   with how to potentially hide his criminal acts make him an

8   ongoing danger to the community.

9        And so, I don't believe that simply keeping him at

10  home, simply putting him on an electronic monitor, is going to

11  protect the public from Mr. McChester, a man who has

12  demonstrated in the past a willingness to abuse his position of

13  trust to harm children.  And I might add, successfully harm

14  children.  This is not the case that the Court typically hears

15  where we have an individual who was attempting to meet with a

16  child and, by the grace of God or whatever he was actually

17  communicating with undercover police officers or detectives.

18  This is a situation where Mr. McChester actually was able to

19  sexually assault the child on numerous occasions.

20       So, I would argue that he remains an ongoing danger

21  to the community and I'm asking that he be detained without

22  bond.

23       **THE COURT:**  Mr. Gould?

24       **MR. GOULD:**  First and foremost, your Honor, I think

25  Mr. Duke is way, way off base in prefacing his arguments

1   against bond on what he calls child rape and child sexual

2   assault.  In the first place, there's no evidence of that other

3   than some uncorroborated third party hearsay from a federal

4   agent.

5          In the second place, the law is clear that the

6   dangers that the Court is supposed to consider in determining

7   whether to go beyond the rebuttal of presumption have to relate

8   to the federal case and the federal case only.  And your Honor,

9   I'm referencing *U.S. versus Ploof*, 851 Fed.2d 11; and *U.S.*

10  *versus Seit* (phonetic), 233 Fed.Supp.2d 221.

11         In this case, your Honor, the federal case that we

12  have is online solicitation, so let's talk about that danger.

13  The Court can certainly craft a combination of pretrial burdens

14  or a single pretrial burden which would prevent the community

15  from danger and ensure that my client makes it to trial.

16         I think that we have successfully rebutted the

17  presumption, your Honor, and I do agree there is a presumption.

18  I agree with counsel.  But my client has rebutted the

19  presumption by his character, his family ties, his length of

20  residence in the community, his community ties, his lack of

21  past criminal conduct and his past conduct in the community; by

22  the fact that he has no history of alcohol and/or drug abuse;

23  the fact that he turned himself in voluntarily; and by the fact

24  that he has had steady employment since graduating from high

25  school.  Your Honor, those are nine of the 3142(g) factors and

1    I believe we've rebutted the presumption.

2         So, at this point the question is, is there a danger

3    to the community of my client engaging in further online

4    solicitation or is there danger that he's going to be a flight

5    risk.  And, your Honor, we agree with Pretrial Services that we

6    believe that the Court, based upon these factors, can assess

7    these risks and can address these risks with an appropriate

8    combination of pretrial bond conditions.  And we'd ask the

9    Court to do that.

10         Your Honor, my client's parents have indicated to me

11   they're willing to be third party custodians.  My client stays

12   with them most of the time, anyway.  They all go to the same

13   church together.  They spend time together and he's willing to

14   submit to any and all conditions that the Court deems

15   appropriate.

16         **THE COURT:**  Let me ask you this, Mr. Gould.  Your

17   client's parents, are they willing to allow your client to live

18   with them?

19         **MR. GOULD:**  They are, your Honor, and we have had

20   that discussion and I think Pretrial has also had that

21   discussion with them.

22         **THE COURT:**  Are your client's parents willing to

23   serve as co-sureties in the case?

24         **MR. GOULD:**  They are, your Honor.  We've had that

25   conversation, as well.

1    **THE COURT**:  Are your client's -- do your client's

2    parents have access to the Internet at their home and do they

3    have cell phones?

4        **(Pause; Attorney confers with Defendant)**

5        **MR. GOULD**:  They do, your Honor.  However, if the

6    Court decides that it's inappropriate for that to be in the

7    house, I'm sure they would be willing to cut that Internet

8    access off, as well as comply with any of the Court's orders

9    regarding cell phone usage or access.

10       **THE COURT**:  Are your client's parents willing to

11   submit at random, when requested, to any kind of a search of

12   their home?

13       **MR. GOULD**:  They would, your Honor.  Not a problem at

14   all.

15       **THE COURT**:  Okay.  Mr. Duke?

16       **MR. DUKE**:  Your Honor, the age that we live in, the

17   ease of electronic media, communication devices, they could

18   easily be brought into a home.  They could easily be removed

19   from the home.  They can easily be hidden within the home.  I

20   don't believe that there really is truly a way to protect the

21   public from Mr. McChester obtaining one of these devices and

22   using it to further commit additional crimes.

23       Moreover, I have repeatedly heard this very Court

24   state that it is aware of a difference with respect to persons

25   who were sexually interested in children who simply look at

1   images or maybe even attempt to contact children versus those

2   who have actually been successful in sexually assaulting

3   children.  And the comments that I've heard this Court make in

4   the past are that such individuals present, basically, a danger

5   that is so great that the public cannot be protected.

6          And here we have, granted it's a statement by a

7   single victim, but one that has been largely corroborated

8   through her descriptions of the locations of the acts,

9   descriptions of the defendant's home, descriptions of

10  everything, as well as his own corresponding acknowledgment in

11  the chats that these acts did, in fact, occur.  And they

12  occurred over an extended period of time and they occurred with

13  some attempts by the defendant to conceal his illegal

14  activities.

15         So, he is a person who is well used to dodging the

16  law, so to speak, with respect to his criminal activity.  And I

17  would urge this Court to consider Mr. McChester and what he's

18  done and compare it against this Court's comments in other

19  cases and this Court's review of other cases and recognize that

20  Mr. McChester is very much a danger to the community.

21         **THE COURT:**  Mr. Duke, do you have any evidence that -

22  - other than these discussions about eliminating the chats, the

23  written chats that they're having -- do you have -- and the

24  victim's statement that she was afraid -- were there any

25  threats made -- are you aware of any threats made by

1   Mr. McChester to this victim or to anyone else about any

2   threats regarding testimony or cooperation with an

3   investigation?

4           MR. DUKE:  No, your Honor.

5           THE COURT:  Okay.  Mr. Gould, do you have anything

6   else?

7           MR. GOULD:  Your Honor, nothing other than I think we

8   do have a disagreement over how reliable the evidence is.  I

9   think that the facts of this particular case, dealing with an

10  online solicitation being alleged, I think the Court can and

11  should craft some bond conditions that will adequately protect

12  the community.  My client is willing to submit to, you know,

13  GPS tracking or monitoring or whatever the Court thinks is

14  appropriate.

15          THE COURT:  Mr. Duke, did you have anything else?

16          MR. DUKE:  No, your Honor.

17          THE COURT:  There are -- Mr. McChester, would you

18  stand, please?  There are a number of factors that I must

19  examine in determining whether or not to detain you.  This is a

20  presumption case.  That means that under our statues, Congress

21  has determined that there is a presumption -- it is a

22  rebuttable presumption, but there is nonetheless a presumption

23  -- based upon the offense that you've been charged with that

24  there are no conditions or combination of conditions which

25  would ensure your appearance and the safety of the community.

1            There are a number of factors that I must examine in

2    determining whether or not to -- whether or not that

3    presumption has been rebutted.  The first is the strength of

4    the evidence against you and I do believe, based on everything

5    I've heard, that the evidence against you is substantial.

6            With regard to the other factors that I must examine,

7    I'm going to adopt as my own the findings and conclusions

8    contained in the Pretrial Services report supplemented by the

9    proffer of your attorney, along with the testimony of Mr. Odom.

10            The defendant is a United States citizen.  He has a

11    clean criminal history.  He has supportive parents and I

12    believe that conditions of bond can be fashioned that would

13    protect the community and the victim and ensure the defendant's

14    appearance in court.

15            I'm going to have conditions that are a little bit

16    more onerous than those that were recommended by Pretrial

17    Services and set bond at $100,000.  I'm going to require a cash

18    deposit of $20,000.  And the defendant's parents are to sign

19    the bond as third party custodians and also as co-sureties.

20    And if additional co-sureties are required, then additional co-

21    sureties will have to be required to secure the full $100,000

22    on the bond.  That's to be fully secured with non-exempt

23    properties.

24            The defendant's parents have to agree to serve as

25    third party custodians.  They have to agree to allow the

1    defendant to live with them.  The defendant is to reside with

2    his parents.  His travel is going to be restricted to Nueces

3    County.  He's to surrender his passport within two days of

4    release.  If not located, he's to submit a notice to the State

5    Department and provide proof that he's done so to Pretrial

6    Services.  He cannot apply for a passport or possess a passport

7    while on pretrial release.

8            The defendant is going to be restricted to his

9    residence.  Now, the defendant -- he's going to have to

10   maintain a land line home telephone, but other than the land

11   line home telephone, if the defendant's parents have access to

12   the Internet, that's to be cut off and all computers are to be

13   removed from the home.

14           And -- I hate to do this because it's just almost

15   impossible to live without a cell phone these days, but the

16   defendant's parents are going to be required to turn in their

17   cell phones and not use them during the period of time that the

18   defendant is on bond.  I don't know of any other way to keep

19   the defendant from accessing the Internet because phones, this

20   day and age, are almost always Internet enabled.

21           So, the defendant's parents are to turn their cell

22   phones in and not have cell phones while the defendant's on

23   bond.  The defendant cannot also, obviously, have a cell phone,

24   any PDA, any cellular device, any wireless device and neither

25   can the parents while on bond.  I don't mind if the parents

1   give their cell phones to a neighbor or another family member

2   who doesn't live there in the home and utilize them when

3   they're not there in the home.  But they're not to have them in

4   their possession or in the home.

5           The defendant is to refrain from possessing a

6   firearm, destructive device or other dangerous weapons.  The

7   defendant cannot possess any pornographic material while on

8   pretrial release.  Defendant cannot have any contact with

9   anyone under the age of 18 unless approved by Pretrial

10  Services.

11          The defendant is to avoid all contact directly or

12  indirectly with any persons who are or may become a victim or

13  potential witness in this subject investigation, including the

14  minor in this case and anybody else who's been mentioned here

15  in the courtroom.  The defendant shall not frequent any

16  establishment catering to minor children, including schools,

17  child care centers, movie, park, theaters; not even

18  restaurants, because the defendant's going to be on home

19  detention.  So, he's not going to be able to go anywhere except

20  for absences pre-approved by his Pretrial Services officer.

21          I'm going to leave the -- if he is already an

22  established member of a church, he will be permitted to go to

23  church services and engage in religious activities, but not

24  other extra-curricular church activities like going down for a

25  dinner or anything like that.  And he needs to stay away from

1  children while he is there.

2          Defendant cannot possess or operate a computer or

3  utilize the Internet at all while on pretrial release.  No

4  photography equipment; that's all to be removed from the home.

5  The defendant and his parents are going to have to submit their

6  telephone bills, cable bills, cell telephone bills at the

7  discretion of Pretrial Services.

8          The defendant's parents are going to have to agree

9  that their home can be searched -- and the defendant's home.

10  He's not going to be living there and he doesn't really have

11  any business to be over there, but the defendant's home.  And

12  the defendant's parents have to agree that their homes can be

13  searched by a Corpus Christi police officer or by a Pretrial

14  Services officer at their request and their person has to agree

15  to be searched for cell phones in their personal possession,

16  such as their car and their purses, briefcases, anything like

17  that.  That is all to be subject to search by Pretrial

18  Services.  And they have to agree to do that by signing the

19  bond.

20          The defendant is to be on home confinement.  He's to

21  have a GPS tracker.  He's going to be restricted and locked

22  down to his home at all times, except for medical necessities,

23  court appearances, visiting his attorney and church services if

24  it's verified that he is a regular member of a church and that

25  he goes with his parents.  His parents have to agree to sign

1    the bond and agree to assist in carrying out these conditions.

2          In setting bond in this case, one of the things that
3    I've taken into consideration is that if the defendant has any
4    kind of a text message with anyone, there's going to be a
5    record of it.  This is not going to be a he said she said kind
6    of thing.  If the defendant utilizes a cell phone to try to
7    contact somebody, there is a written record of it even if it is
8    deleted.  I'm quite frankly kind of surprised that
9    Mr. McChester thought that once things were deleted that that
10   was it.  That's not it.  There is a record of everything and we
11   will know.

12         Mr. Duke, without waiving any objection that you have
13   to my ruling, do you have any other conditions that you would
14   like to suggest?

15         **MR. DUKE:**  Yes, your Honor.  With all due respect to
16   the Court, there's not always a record of everything.  In fact,
17   Mr. McChester was communicating with the victim by use of a
18   telephone, the traditional means of oral communications, and
19   the content of that communication would not be known.

20         The fact that there's going to be a telephone in the
21   home is of great concern to the government because he has, in
22   fact, by the evidence that we've obtained so far in the
23   investigation, been communicating with his victims via the
24   telephone.  And that is going to continue to be available to
25   him under the conditions that the Court has set for bond today.

1          The only thing that I can do, which is not nearly

2   enough to protect the public, is I would request as an

3   additional condition of his bond, since there will be a phone

4   in the home that he has access to, that we be permitted to

5   review the phone toll records to determine who -- what calls

6   are going into and out of the home.  Of course, this will not

7   prevent Mr. McChester from saying whatever he wants in those

8   communications with any number of potential victims.  But I

9   would ask that to be an additional condition.

10          **THE COURT:**  You want something in the nature of a

11  trap and trace?  Permission to put a trap and trace on the

12  phone?

13          **MR. DUKE:**  Yes, your Honor.

14          **THE COURT:**  Sure.  That's perfectly appropriate.

15  Because I think there has to be a telephone in the home.

16          **MR. DUKE:**  There does.

17          **THE COURT:**  I know there doesn't have to be for GPS,

18  right?

19          **MS. ESPINOSA:**  That's absolutely correct.  In fact,

20  we could actually supervise him with a cellular phone that is

21  basically initiated through our office, your Honor.  So, if the

22  Court is more comfortable with that, we're happy to oblige.

23          **THE COURT:**  Well, but how do you contact him when you

24  need to tell him when he's supposed to come to court if there's

25  no phone in the house and nobody you can call and tell?

1          **MS. ESPINOSA:**  We -- usually when we're recommending

2    GPS, it is without a land telephone line and it's with the cell

3    phone that we provide the defendant, your Honor.

4          **THE COURT:**  Well, I still think he needs to have a

5    land line home telephone at the house and I'm going to give the

6    government any kind of trap and trace order that they need to

7    keep track of all the numbers that are dialed or pulsed in or

8    out of that telephone.

9          So, if your client's parents are willing to do this,

10   Mr. Gould, it is a huge infringement on their privacy rights

11   and you need to make sure that they understand that before they

12   come in here and sign this document, because they're pretty

13   much opening up their home and everything they own to search

14   anytime, anywhere that anybody wants to search them.  I don't

15   know of any other way to try to protect the public from

16   Mr. McChester.  So, if they're willing to do that, I'm willing

17   to put him on bond.

18         Now, before I go any further on this, Mr. Duke, do

19   you want -- are you intending to appeal and do you want a stay

20   to appeal?

21         **MR. DUKE:**  That's correct, your Honor.

22         **THE COURT:**  Okay.  I'll give you a stay in the

23   activation of the bond until Monday to get your motion filed

24   and also to order and make arrangements to pay for a transcript

25   of the hearing.

1    **MR. DUKE:**  Yes, your Honor.

2    **THE COURT:**  So, Monday at 5:00.  And then after that

3  if there's no motion filed, then the bond will go into effect

4  and the defendant can begin to take the steps necessary to post

5  the bond.

6    Mr. McChester -- Mr. Gould, did you have anything you

7  wanted to say?

8    **MR. GOULD:**  Nothing further, your Honor.

9    **THE COURT:**  Mr. McChester, do you understand all the

10  conditions of your bond?

11    **THE DEFENDANT:**  Yes, ma'am.

12    **THE COURT:**  Oh, and -- I don't remember.  Did it say

13  anything in here about firearms?  There is a condition that you

14  not possess a firearm, destructive device or other dangerous

15  weapons.  It's also to be verified that all firearms and any

16  other destructive device or dangerous weapon be removed from

17  the home before Mr. McChester is allowed to go there, so that

18  family, if they keep firearms, they need to put them with

19  relatives or somebody else.

20    Do you understand all the conditions of your bond,

21  Mr. McChester?

22    **THE DEFENDANT:**  Yes, ma'am.

23    **THE COURT:**  Do you understand that if you fail to

24  appear in court when you're supposed to or if you violate any

25  condition of your bond, that a warrant could issue for your

1    arrest, your bond could be revoked and you could be charged

2    with committing another crime of failure to appear?

3              **THE DEFENDANT:**  Yes, ma'am.

4              **THE COURT:**  All right.  And Ms. Martinez, did you

5    have anything else?

6              **MS. ESPINOSA:**  No, your Honor.

7              **THE COURT:**  Okay.  All right.

8              Anything further, Mr. Gould?

9              **MR. GOULD:**  Nothing further.

10             **THE COURT:**  Mr. Duke?

11             **MR. DUKE:**  No, your Honor.

12             **THE COURT:**  All right.  Thank you for your

13    appearances.  Defendant is remanded to the custody of the

14    marshals.  Parties are excused.  Thank you.  We'll be in

15    recess.

16         **(Proceeding was adjourned at 12:03 p.m.)**

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.


_____                    <u>April 24, 2012</u>

            Signed                                        Dated


                    *TONI HUDSON, TRANSCRIBER*